**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AIG FINANCIAL PRODUCTS CORP., | ) | |
| | ) | Case No. 22-11309 (MFW) |
| Debtor. | ) | |
| | ) | Rel Docs: 101, 132, 135, |
| | ) | 161 |
| _____ | ) | |

### OPINION[1]

Before the Court is a Motion to Dismiss the chapter 11 bankruptcy case of AIG Financial Products Corporation (the "Debtor"). The Motion was filed by former employees of the Debtor who sued it in Connecticut state court for deferred compensation (the "CT Plaintiffs").[2] For the reasons stated below, the Court will deny the Motion to Dismiss or Abstain.

I.   BACKGROUND

The Debtor is a wholly owned subsidiary of American International Group, Inc. ("AIG"). The Debtor was founded in 1987 as a joint venture between AIG and a group of Drexel Lambert investment bankers to allow AIG to access the capital markets and

---

[1]   This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rules 7052 and 9013(c) of the Federal Rules of Bankruptcy Procedure.

[2]   Arthurs v. AIG Financial Products Corp., Case No. X08-FST-CV-19-6046057-S, 2021 WL 2303051, at *1 (Conn. Super. Ct. May 24, 2021).

generate returns from trading in complex financial derivatives.[3]

In December 1995, AIG and the Debtor entered into a General Guarantee Agreement (the "Parent Guarantee") by which AIG "generally agreed to guarantee all of [the Debtor's] monetary obligations."[4]  To the extent AIG paid an obligation of the Debtor under the Parent Guarantee, AIG held a subrogated claim against the Debtor.[5]

In 1995, the Debtor also created a Deferred Compensation Plan (the "DCP") and a Special Incentive Plan (the "SIP") (collectively the "Compensation Plans") whereby a portion of the compensation of its highly compensated executives (the "Plan Participants") was deferred.[6]  The deferred compensation was not segregated from the Debtor's general funds nor held in trust for the Plan Participants, but simply reflected on a ledger of their accounts.[7]  Further, the Compensation Plans expressly provided that the benefits due to the Plan Participants "shall not have the benefit of any guarantee by AIG of payment obligations of

---

[3]    D.I. 2 ¶ 10.

[4]    D.I. 132 Ex. D.

[5]    Id. at ¶ 5.

[6]    D.I. 2 Ex. C at p. 2.  Those Plans also provided that certain amounts due by the Debtor to AIG were also to be deferred.  Id. at ¶ 43 & Ex. C at p. 2.

[7]    Id. at Ex. C at § 4.01(a).

[the Debtor]."[8]  The Plan Participants' accounts were subject to being reduced by the amount of any losses suffered by the Debtor in excess of certain reserves, but the Debtor was required to restore those balances (with interest) from future profits pursuant to a plan to be proposed by its board of directors.[9]  In the event of an insolvency or bankruptcy proceeding, the Compensation Plans provided that the Plan Participants had an unsecured claim for any amounts due to them under the Plans.[10]

In September 2008, as a result of the national financial crisis, AIG (initially through its subsidiary AIG Funding, Inc.) entered into a $65 million revolving credit agreement with the Debtor (the "Revolver").[11]  Thereafter, AIG fulfilled its obligation under the Parent Guarantee by extending loans to the Debtor under the Revolver.[12]  Because the Debtor had continuing losses after 2008, the Debtor was able to reduce the Plan Participants' accounts under the Compensation Plans to honor its commitments on its derivative products.[13]

---

[8]    Id.

[9]    Id. at ¶¶ 20, 46 & Ex. C at § 4.01(a).  If the funds were not repaid by 2013 (or by a later time set by the board), then the restoration rights would lapse.  Id. at Ex. C at § 4.01(a).

[10]    Id. at Ex. C at § 4.01(a).

[11]    Id. at ¶ 35 & Ex. A.  The Revolver is governed by New York state law.  D.I. 2 Ex. A at § 4.2.

[12]    Id. at ¶¶ 46–52.

[13]    Id. at Ex. C at § 4.01(b).

In October 2014, a group of London-based Plan Participants (the "English Participants") sued the Debtor in England seeking payments of deferred compensation allegedly owed to them under the Compensation Plans.[14]  The English Participants asserted that the Debtor had failed to restore their account balances or adopt any plan to do so by December 2013, in breach of its obligation under the Compensation Plans.[15]  They also brought a separate tort claim against AIG.[16]  After a bench trial in November 2018, the English Court dismissed the tort claim against AIG.  However, the Court found that the Debtor had an "unqualified" obligation to restore the account balances and had breached the Compensation Plans when it failed to do so.[17]  The Debtor appealed and in January 2020, the English Court of Appeal unanimously reversed the trial court decision by holding as a matter of Connecticut law that the Debtor had not breached the Compensation Plans.[18]

In December 2019, the CT Plaintiffs filed a complaint against the Debtor in the Connecticut Superior Court, alleging breach of contract, breach of the implied covenant of good faith, and bad faith violations of the Connecticut Wage and Hour Act

---

[14]   Id. at ¶ 53.

[15]   Id.

[16]   Id.

[17]   Id. at ¶ 40.

[18]   Id. at ¶ 54.

(the "CT Litigation").[19]  In May 2021, the Connecticut Court denied the Debtor's motion to dismiss that complaint.[20]  In August 2022, the CT Plaintiffs filed a motion to compel the Debtor to produce certain documents that it had withheld or redacted as privileged.  The Connecticut Court granted that motion in part, finding that the Debtor had waived the attorney-client privilege with respect to a potential recapitalization of the Debtor by AIG and the restoration of the Compensation Plans.[21]  The Court ordered the Debtor to produce 14 specific documents in unredacted form by December 14, 2022.

The Debtor did not produce the Court-ordered documents and instead filed a voluntary petition under chapter 11 of the Bankruptcy Code on December 14, 2022.[22]  On the same day, the Debtor filed a proposed plan of reorganization and related disclosure statement.[23]  The Plan provides for a reorganization of the Debtor by converting AIG's claim to equity and, if the CT Plaintiffs' class accepts the plan, a pro rata distribution to them from a $1 million pot.[24]

---

[19]    Id. at ¶¶ 56-57.

[20]    Id. at ¶ 58.

[21]    D.I. 162 Ex. V.

[22]    D.I. 1.

[23]    D.I. 6 & 7.

[24]    D.I. 7 at I.A.2.

The CT Plaintiffs filed their motion to dismiss the Debtor's case on January 13, 2023.[25]  The CT Plaintiffs seek dismissal because they allege that the case: (i) was filed in bad faith,[26] (ii) will result in the substantial or continuing loss to or diminution of the estate without a reasonable likelihood of rehabilitation,[27] and (iii) should be dismissed in the best interests of creditors and the Debtor.[28]  The Debtor filed an objection to the Motion.[29]  AIG filed a joinder in the Debtor's objection.[30]  The CT Plaintiffs filed a reply on March 20, 2023.[31] An evidentiary hearing was held on March 27, 2023.  The matter was held under advisement and is now ripe for decision.

II.  JURISDICTION

The Motion is a core proceeding over which the Court has subject-matter jurisdiction.[32]  Additionally, the parties have implicitly consented to the entry of a final order by this

---

[25]   D.I. 101.

[26]   11 U.S.C. § 1112(b)(1).

[27]   Id. at § 1112(b)(4)(A).

[28]   Id. at § 305.

[29]   D.I. 132.

[30]   D.I. 135.

[31]   D.I. 161.

[32]   28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(O) & 1334(b).

Court.[33]

III.   DISCUSSION

The CT Plaintiffs contend that the Court must dismiss the Debtor's case under section 1112(b) or section 305(a).  The Debtor contends that there is no basis to dismiss its case.

A.   Dismissal under Section 1112(b)

Section 1112(b)(1) provides that "on request of a party in interest, and after notice and a hearing, the court shall convert. . . or dismiss a case for cause . . . ."[34]  Section 1112(b)(4) provides a non-exhaustive list of what may constitute cause for dismissal or conversion of a chapter 11 case.[35]

---

[33]   Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 683-84 (2015) (holding that the bankruptcy court may enter a final order without offending Article III so long as the parties consent and that such consent need not be express).  See also Del. Bankr. L.R. 9013-1(f) & (h) (requiring that all motions and objections "contain a statement that the [filing party] does or does not consent to the entry of final orders" and that in the absence of such a statement, the party "shall have waived the right to contest the authority of the Court to entire final orders or judgments.").

[34]   11 U.S.C. § 1112(b)(1).

[35]   For purposes of this subsection, the term "cause" includes —
    (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
    (B) gross mismanagement of the estate;
    (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
    (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
    (E) failure to comply with an order of the

1.   Good Faith

The CT Plaintiffs argue that, although it is not expressly listed in section 1112(b)(4), the Third Circuit has held that a failure to file a case in good faith is cause to dismiss that case.[36]   The CT Plaintiffs contend that it is the Debtor's burden

---

court;
(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under Rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
(H) failure timely to provide information or attend meetings reasonably requested by the United States Trustee (or the bankruptcy administrator, if any);
(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;
(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;
(K) failure to pay any fees or charges required under chapter 123 of title 28;
(L) revocation of an order of confirmation under section 1144;
(M) inability to effectuate substantial consummation of a confirmed plan;
(N) material default by the debtor with respect to a confirmed plan;
(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan;
(P) failure of a debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.
11 U.S.C. § 1112(b)(4)(A)-(P).

[36]   In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999).

to establish it filed its case in good faith.[37]

The Debtor does not contest the requirement of good faith in filing a petition under the Bankruptcy Code, but asserts that its petition meets that requirement.

The Court agrees with the parties that a threshold issue in determining a debtor's eligibility to file a chapter 11 bankruptcy petition is whether it has been filed in good faith.[38] "Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'"[39]

The CT Plaintiffs assert that the Debtor did not file its case in good faith because (a) it was not experiencing financial

---

[37]   Id. at 162 n.10.

[38]   See, e.g., In re LTL Mgmt., LLC, 64 F.4th 84, 100 (3d Cir. 2023) (holding that chapter 11 bankruptcy petitions are subject to dismissal unless filed in good faith); In re 15375 Mem'l Corp., 589 F.3d 605, 618 (3d Cir. 2009) (same); In re Integrated Telecom Express, Inc., 384 F.3d 108, 129 (3d Cir. 2008) (same); In re Rent-A-Wreck of Am., Inc., 580 B.R. 364, 375 (Bankr. D. Del. 2018) (stating that good faith is a predicate to the right to file a petition in bankruptcy). Cf. Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 367, 374 (2007) (holding that, just as federal courts have unanimously held that the original filing of a bankruptcy case requires good faith, a debtor who does not act in good faith forfeits the right to convert its case, because "[t]hat individual . . . is not a member of the class of 'honest but unfortunate debtor[s]' that the bankruptcy laws were enacted to protect.") (citation omitted).

[39]   SGL Carbon, 200 F.3d at 162.

distress of the type required by precedent in the Third Circuit and (b) the filing does not serve a valid reorganizational purpose.[40]

The Debtor asserts that it meets those criteria because it is indisputably insolvent and filed its petition for a valid purpose, namely, to conduct an orderly liquidation of its assets and to distribute the proceeds in accordance with the priorities of the Code.[41]

a.   Financial Distress

The CT Plaintiffs argue that the facts show that the Debtor was not in any financial distress.  They note that on the eve of the bankruptcy filing, the Debtor was flush with cash, no creditor was pressuring it for payment, and its obligations to counter-parties were guaranteed by AIG which had billions of

---

[40]    LTL Mgmt., 64 F.4th at 110 (holding that where a debtor is not experiencing financial distress, it cannot show its petition served a valid bankruptcy purpose and was filed in good faith under section 1112(b) of the Bankruptcy Code); 15375 Mem'l Corp., 589 F.3d at 618 (holding that dismissal was proper where the debtors' bankruptcy petitions served no valid bankruptcy purpose and were used as a litigation tactic to protect the debtor and its parent from liability in pending litigation); Integrated Telecom, 384 F.3d at 129-30 (holding that dismissal was appropriate where a company was not experiencing financial distress and the filing did not preserve any value that would have otherwise been lost outside of bankruptcy).

[41]    Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.), 324 F.3d 197, 211 (3d Cir. 2003) (holding that the Bankruptcy Code "clearly contemplates liquidating plans under 11 U.S.C. § 1123(b)(4), whereby a debtor may develop a [c]hapter 11 plan to sell off its assets.").

dollars in cash reserves.[42]

The CT Plaintiffs contend that because the Third Circuit has held that a debtor who is not experiencing financial distress cannot demonstrate that its chapter 11 petition serves a valid bankruptcy purpose, the Debtor's petition must be dismissed as having been filed in bad faith.[43]

The Debtor asserts that it is experiencing financial distress because it is massively insolvent: it currently owes $37 billion under the Revolver to AIG, risks hundreds of millions of dollars in losses from its derivative business, and the CT Plaintiffs have asserted in excess of $640 million is due to them.[44]  It contends that its remaining assets are insignificant in comparison.  The Debtor argues that it has a right to file a petition under chapter 11 to stop its competing unsecured creditors from racing to the courthouse to get its few remaining assets.[45]

---

[42]   D.I. 173 at 264:13-22.

[43]   LTL Mgmt., 64 F.4th at 101 (citing SGL Carbon, 200 F.3d at 165).  See also Integrated Telecom, 384 F.3d at 129 (holding that because the debtor was not experiencing financial distress, its chapter 11 petition was not filed in good faith since it did not preserve any value for creditors that would have been lost outside of bankruptcy) SGL Carbon, 200 F.3d at 167-70 (dismissing petition after concluding that pending lawsuits were not sufficient to threaten the debtor's substantial financial health or force it out of business).

[44]   D.I. 173 at 28:2-8, 116:21-23.

[45]   Id. at 248:8-15.

The CT Plaintiffs respond that to establish financial distress, the Debtor's insolvency analysis depends largely on the amounts it owes AIG under the Parent Guarantee.  They contend that the overwhelming proportion of debt owed to insiders[46] in this case weighs against a finding of good faith because the Debtor seeks to distribute value directly from non-insider creditors to its shareholder.[47]

The Debtor argues that only <u>its</u> financial condition is determinative, as separateness of legal entities is foundational to corporate and bankruptcy law.[48]  It also argues that it is balance-sheet insolvent by a huge margin establishing that the

---

[46]    The Court in <u>Rent-A-Wreck</u> stated:
Courts consider factors such as: solvency; cash reserves; recent financial performance and profitability; <u>the proportion of debt owed to insiders</u>; realistic estimates of actual or likely liability; the threat of litigation; whether a debt is fixed, substantial, and imminent; current cash position or current liquidity; ability to raise capital; and overdue debts or the ability to pay debts as they come due.
<u>580 B.R. at 375</u> (emphasis added).

[47]    <u>Integrated Telecom</u>, <u>384 F.3d at 129</u> (noting that the requirement of creating or preserving some value that would otherwise be lost is "particularly sensitive where the petition seeks to distribute value directly from a creditor to a company's shareholders.").  <u>See also</u> <u>SGL Carbon</u>, 200 F.3d at (finding a lack of good faith where the debtor had only a small amount of non-insider fixed undisputed liabilities, while the vast majority of its liabilities were owed to, or guaranteed by, a financially robust and cash-rich parent.

[48]    <u>LTL Mgmt.</u>, <u>64 F.4th at 105</u>.

Debtor is experiencing financial distress.[49]

The Court does not agree with the CT Plaintiffs' contention that in determining the Debtor's solvency, the Court must consider the financial condition of its parent, AIG.  The financial condition of AIG is irrelevant because it is a separate legal entity from the Debtor.[50]  Further, even though AIG guaranteed certain obligations of the Debtor (those due to the derivative counter-parties), it did not cover obligations to the CT Plaintiffs which they assert are in excess of $640 million.

In addition, the Parent Guarantee was in the form of a loan, which meant that all payments under the Guarantee simply became debts owed by the Debtor to AIG rather than obligations owed to the derivative counter-parties.  It did not eliminate any debt from the Debtor's balance sheet.  Finally, AIG is under no obligation to continue to fund the Debtor indefinitely.[51]  Accordingly, the Court finds that the Debtor is overwhelmingly insolvent because its remaining assets are a fraction of the $38 billion in debts allegedly owed to AIG and the CT Plaintiffs.

The Court also rejects the CT Plaintiffs' argument that an insolvent debtor cannot file a bankruptcy petition if it is not

---

[49]    Id. at 102 (noting that a debtor's "balance-sheet insolvency or insufficient cash flows to pay liabilities (or the future likelihood of these issues occurring) are likely always relevant.").

[50]    Id. at 105.

[51]    D.I. 132 Ex. E at § 1.1.

facing imminent financial distress in the form of pressure for immediate payment from creditors.  The cases cited by the CT Plaintiffs for that proposition involved <u>solvent</u> debtors who were <u>not</u> facing any imminent financial pressure or distress.[52]  They do not stand for the proposition that an insolvent debtor is not eligible for bankruptcy relief.  In fact, the Third Circuit has stated that:

> [T]he good-faith gateway asks whether the debtor faces the kinds of problems that justify Chapter 11 relief. Though insolvency is not strictly required, and "no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith," we cannot ignore that a debtor's balance-sheet insolvency or insufficient cash flows to pay liabilities (or the future likelihood of these issues occurring) are likely always relevant.  This is because [insolvent debtors] "pose a problem Chapter 11 is designed to address: 'that the system of individual creditor remedies may be bad for the creditors <u>as a group</u> when there are <u>not enough assets to go</u>

---

[52]   <u>LTL Mgmt.</u>, <u>64 F.4th at 101</u> (finding dismissal appropriate where a solvent debtor filed its bankruptcy petition to address concerns regarding ongoing pending litigation and was not experiencing any immediate financial distress); <u>15375 Mem'l Corp.</u>, <u>589 F.3d at 618</u> (same); <u>Integrated Telecom</u>, <u>384 F.3d at 119</u> (finding dismissal appropriate where a solvent debtor filed its petition to take advantage of a code provision and had no intention of reorganizing or liquidating as a going concern and no reasonable expectation that chapter 11 proceedings would maximize the value of its estate for creditors) ; <u>SGL Carbon</u>, <u>200 F.3d at 167-70</u> (dismissing petition after concluding that pending lawsuits were not sufficient to threaten the debtor's substantial financial health or force it out of business); <u>Rent-A-Wreck</u>, <u>580 B.R. at 377</u> ("Because Debtors do not take the position that they are insolvent, and because they did not provide evidence on the value of their most significant assets, for purposes of this analysis, I treat Debtors as solvent.").

<u>around.'"</u>[53]

The Court in <u>Integrated Telecom</u> distinguished that case, where the debtor was solvent, from the <u>PPI</u> case where the debtor was insolvent.[54]   The <u>Integrated Telecom</u> Court stated that <u>PPI</u> "stands for the proposition that an insolvent debtor can file under Chapter 11 in order to maximize the value of its sole asset to satisfy its creditors, while at the same time availing itself of the landlord cap under § 502(b)(6)."[55]   Similarly, the Court in <u>SGL Carbon</u> noted that

> It is well established that a debtor need not be insolvent before filing for bankruptcy protection.  It also is clear that the drafters of the Bankruptcy Code understood the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation.[56]

The conclusion of the Third Circuit in <u>LTL Management</u>, <u>SGL Carbon</u>, and <u>Integrated Telecom</u> that the solvent debtors in those cases did not file their petitions in good faith because they were not facing imminent financial hardship stands in stark

---

[53]   <u>LTL Mgmt.</u>, <u>64 F. 4th at 102</u> (internal citations omitted).

[54]   <u>PPI</u>, <u>324 F.3d at 211</u> (finding debtor's bankruptcy filing was in good faith where debtor owed $54 million in obligations and its only asset was worth less than $12 million in bankruptcy but a tenth of that outside bankruptcy.)

[55]   <u>Integrated Telecom</u>, <u>384 F.3d at 122-23</u>.

[56]   <u>SGL Carbon</u>, <u>200 F.3d at 163</u>.  <u>See also</u> <u>In re Johns-Manville Corp.</u>, <u>36 B.R. 727</u>, <u>736</u> (Bankr. S.D.N.Y. 1984) ("Accordingly, the drafters of the Code envisioned that a financially beleaguered debtor with real debt and real creditors should not be required to wait until the economic situation is beyond repair in order to file a reorganization petition.").

contrast to the facts of this case where a Debtor with minimal remaining assets faces a debt burden of more than $38 billion. The Debtor in this case has no prospect of ever realizing sufficient cash to pay even a fraction of its obligations and is facing mounting legal bills to defend a suit by a small group of its creditors.  The Debtor need not wait until judgment is entered against it to file a bankruptcy petition.[57]  The Court, therefore, concludes that the Debtor does face sufficient financial distress to warrant a bankruptcy filing.

b.  Valid Reorganizational Purpose

The CT Plaintiffs argue that to establish good faith, the Debtor must also establish that its chapter 11 filing serves a valid reorganizational purpose, meaning that it is seeking to preserve some value in bankruptcy that would otherwise be lost.[58] They contend that courts have acknowledged that there are two recognized objectives under chapter 11, namely "preserving going concern value and maximizing property available to satisfy creditors."  The CT Plaintiffs assert that the Debtor's bankruptcy filing fails to meet either of these twin goals.

The CT Plaintiffs allege that the Debtor is not seeking to preserve going-concern value.  They assert that the Debtor has no direct employees and relies on affiliates (including AIG) to

---

[57]   SGL Carbon, 200 F.3d at 163.

[58]   Integrated Telecom, 384 F.3d at 129.

provide it with many services, has been in wind-down mode for years, and effectively has no business to rehabilitate.  While they concede that liquidating plans are permitted under chapter 11, they assert that the Debtor's intention not to continue as a going concern weighs in favor of dismissal.[59]

The CT Plaintiffs also argue that the totality of the circumstances, including the presence of several factors cited by the Primestone[60] Court, also supports dismissal of this case. Specifically, they assert that the case presents a two-party dispute; the Debtor's other creditors are mainly insiders and affiliates who were not pressuring the Debtor for payment; and there is no reorganization or rehabilitation that would inure to the benefit of any non-insiders.

The CT Plaintiffs contend that, rather than a valid reorganizational purpose, the real impetus for filing the bankruptcy case was to give the Debtor a tactical advantage by shifting the CT Litigation away from the Connecticut Court.  This is not a legitimate bankruptcy purpose.[61]  They contend that the

---

[59]   15375 Mem'l Corp., 589 F.3d at 624 (stating that the mere creation of a liquidation plan is not sufficient to show that a plan of reorganization serves a valid reorganizational purpose).

[60]   In re Primestone Inv. Partners, L.P., 272 B.R. 554 (D. Del. 2002).

[61]   See, e.g., SGL Carbon, 200 F.3d at 165-67 (concluding that debtor filed bankruptcy for an invalid purpose, "to put pressure on antitrust plaintiffs to accept the company's settlement terms. . . . [and] solely to gain tactical litigation advantages").  See also LTL Mgmt., 64 F. 4th at 110, n.19 (though not deciding the

Debtor's asserted impetus for the filing (the $37.7 billion claim of AIG) is a mere pretext as that purported loan is in substance an equity infusion.  The CT Plaintiffs allege that the timing of the filing supports their contention that the case was filed in bad faith, because it was commenced on the eve of the deadline for the Debtor to comply with the Connecticut Court's discovery order and after the CT Plaintiffs refused to agree to a settlement.

The Debtor responds that it is not trying to use the bankruptcy case to litigate the same issues pending before the Connecticut Court and that not all the relevant stakeholders (including specifically AIG) are parties to the CT Litigation. Instead, the Debtor argues against dismissal and alleges, among other things, that: (i) it has material unencumbered assets and competing unsecured creditors; (ii) it has employees and an ongoing business of winding down its investments; (iii) the issues in the bankruptcy proceedings are not limited to its dispute with the CT Plaintiffs and cannot be resolved in the CT Litigation; (iv) it has cash on hand; (v) it was facing pressure from other creditors; and (vi) there is a possibility of reorganization.  The Debtor argues that its bankruptcy filing had a valid reorganizational purpose because it was experiencing

---

issue, stating that a filing to change the forum of litigation where there is no financial distress raises the specter of "abuse which mush be guarded against to protect the integrity of the bankruptcy system.") (quoting SGL Carbon, 200 F.3d at 169).

financial distress and the filing preserves material value for the estate by stopping interest accruing on the Revolver and preventing the depletion of its assets caused by the ongoing litigation costs in Connecticut.

The Court agrees that a valid bankruptcy purpose includes preserving going concern value and maximizing the value of the estate for the benefit of creditors.[62] The Debtor's bankruptcy filing serves a valid reorganizational purpose in this case as it is preserving value that would otherwise be lost outside of bankruptcy by stopping the accrual of interest on the Revolver and the costs associated with the Connecticut litigation. Moreover, the Debtor is operating its current derivative business in a manner that reduces losses to the estate.[63]

As noted above, the Third Circuit has held that any determination of the good faith of a debtor's bankruptcy filing is a "fact intensive inquiry" in which the court must examine "the totality of facts and circumstances."[64] The District Court in the Primestone case identified several factors that courts consider in determining whether a case has not been filed for a

---

[62]    Integrated Telecom, 384 F.3d at 120.

[63]    The Debtor transferred its derivative business to a subsidiary before it filed its petition in order to avoid hundreds of millions of dollars in losses which would have occurred as a result of the safe harbor provisions of the Bankruptcy Code.  See 11 U.S.C. §§ 555, 556, 559 & 560. See also Corrie Dep. Tr. at 156:8-17.

[64]    SGL Carbon, 200 F.3d at 162.

valid bankruptcy purpose:

1.   Single asset case;
2.   Few unsecured creditors;
3.   No ongoing business or employees;
4.   Petition filed on eve of foreclosure;
5.   Two-party dispute which can be resolved in pending state court action;
6.   No cash or income;
7.   No pressure from non-moving creditors;
8.   Previous bankruptcy petition;
9.   Prepetition conduct was improper;
10.  Debtor formed immediately prepetition;
11.  Debtor filed solely for the automatic stay; and
12.  Subjective intent of the debtor.[65]

Although no single factor is dispositive, the Court concludes that most of the Primestone factors are absent in this case. The Debtor has more than one asset; it has several creditors, all of whom are unsecured; it has an ongoing business of winding down its portfolio and liquidating its assets and debts; the petition was not filed on the eve of foreclosure; the bankruptcy is not a two-party dispute; the Debtor has cash on hand; the Debtor did not file a previous bankruptcy petition; there is no evidence the Debtor acted improperly pre-petition; and the Debtor was formed almost 30 years ago (not on the eve of bankruptcy).[66]

---

[65]   Primestone, 272 B.R. at 557.

[66]   Although a debtor's subjective intent is one of the factors articulated in Primestone, good faith depends "more on [an] objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11." SGL Carbon, 200 F.3d at 165 (citations omitted).

The CT Plaintiffs allege that there is no pressure from any of the Debtor's creditors other than them.  They contend in particular that there was no pressure to repay the AIG Revolver which has no specified maturity date, no set interest rate, and no repayment schedule.  The Court concludes that this single factor is not dispositive in light of the fact that the CT Plaintiffs were pressuring the Debtor for repayment of their claims which are subordinate to the AIG claim and less than 1/37th the size of AIG's claim.[67]  Given these facts, a bankruptcy filing would be inevitable if the CT Plaintiffs were successful in the Connecticut action because the Debtor does not have enough cash to pay even a fraction of that claim.[68]  Furthermore, the Debtor has no legal right to force AIG to provide additional liquidity.[69]

Therefore, because the Debtor is hopelessly insolvent and has a valid reorganizational purpose, the Court finds that the Debtor's bankruptcy filing satisfies the implicit good faith requirement of section 1112(b).

---

[67]   D.I. 132 Ex. E at § 4.01 & Ex. F at § 4.01.

[68]   See D.I. 2 ¶ 24.

[69]   D.I. 2 Ex. A at § 1.1 ("Subject to the terms and conditions of this Agreement, AIG Funding agrees, in its sole discretion, upon the receipt of an authorized written request from the Borrower, to lend borrower from time to time . . . amounts not exceeding Sixty-Five Billion Dollars [].") (emphasis added).

2.   <u>Dismissal under section 1112(b)(4)(A)</u>

The CT Plaintiffs also argue that the Debtor's bankruptcy filing should be dismissed under section 1112(b)(4)(A).[70]  First, they assert there is a "substantial and continuing loss" to the estate due to the substantial administrative expenses accruing in the case.  Second, they contend that there is "no reasonable likelihood of rehabilitation," because, as the only non-insider creditors, their vote is needed to confirm a plan and they will not vote to accept the Debtor's proposed plan.

The Debtor alleges that it has sufficient liquidity from its cash on hand and the proceeds from a note payable to cover its administrative expenses in full.[71]  It asserts that the prepetition costs it was incurring in defense of the CT Plaintiffs' suit will not continue during this case, thereby reducing the estate's continuing losses.  Furthermore, the Debtor contends that there is a reasonable likelihood of a rehabilitation, because the Plan provides that the Debtor will conduct a simultaneous process to sell "all or substantially all" of its assets to AIG or a third party under section 363.[72]  Thus, if the CT Plaintiffs' class votes to reject the Plan, the Debtor

---

[70]   <u>11 U.S.C. § 1112(b)(4)(A)</u> (providing that cause for dismissal of a case exists where there is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.").

[71]   D.I. 2 ¶ 40.  <u>See also</u> D.I. 173 at 32:18-25, 331:32-33.

[72]   D.I. 7 at I.G.

will be in a position to toggle to a sale promptly.

The CT Plaintiffs respond that toggling to a sale is not feasible, because no third party is willing to buy the Debtor's assets.[73]

Under section 1112(b)(4)(A), the Court must determine (1) whether, post-petition, the debtor has continued to experience a negative cash flow or declining asset values and (2) whether there is any reasonable likelihood that the debtor, or another party, will be able to stop the losses and regain solid financial footing within a reasonable amount of time.[74]  Both tests must be satisfied.[75]

In this case, the Debtor has established that it is not experiencing substantial losses because it has cash on hand and proceeds from a note with which to pay administrative expenses.[76] Further, the Debtor has reduced accruing losses by filing bankruptcy and eliminating (i) interest due on the $37 billion Revolver (accruing at the rate of $133 million per month)[77] and

---

[73]    Corrie Dep. Tr. at 77:12-21 (discussing the Debtor's consideration of alternatives pre-petition and stating that "there was no third party who was going to buy the [Debtor's assets]. And so I'm sure that it was discussed briefly, but it just wasn't a feasible alternative.").

[74]    7 Collier on Bankruptcy ¶ 1112.04 [6][a][i] (16th ed. 2022).

[75]    Id.

[76]    Corrie Dep. Tr. at 215:5-10 (explaining that the Debtor "[w]ill fund the bankruptcy proceedings through its cash . . . as well as the proceeds of the Gibraltar note.").

[77]    Dubel Dep. Tr. at 305:13-20.

(ii) ongoing expenses of the Connecticut litigation (which to date have totaled approximately $16 million).[78]   Furthermore, it is not entirely clear that the CT Plaintiffs will not ultimately agree to some settlement with the Debtor which will allow a plan to be confirmed.[79]   Even if a consensus is not reached, a sale under section 363 is a valid bankruptcy avenue[80] which will stem the Debtor's losses and allow for the orderly monetization of the Debtor's derivative rights.   Notwithstanding the CT Plaintiffs' suggestion, there is no per se prohibition on a sale of a debtor's assets to an insider, although such transactions are subject to a heightened scrutiny standard.[81]

Consequently, the Court concludes that there is no basis to dismiss the Debtor's case under section 1112(b)(4)(A).

---

[78]   D.I. 173 at 29:12-15.

[79]   See, e.g., In re Fur Creations by Varriale, 188 B.R. 754, 758 (Bankr. S.D.N.Y. 1995) ("[C]onsensual means of plan negotiation and confirmation is among the paramount goals of chapter 11."). See also 7 Collier on Bankruptcy ¶ 1129.01 (16th ed. 2022) ("Confirmation of a plan of reorganization is the statutory goal of every chapter 11 case.").

[80]   PPI, 324 F.3d at 211 ("Reorganization . . . is not the only appropriate use of Chapter 11 since the Code clearly contemplates liquidating plans."). Accord 11 U.S.C. § 1123(b)(4) ("A plan may provide for the sale of all or substantially all of the property of the estate and the distribution of the proceeds of such sale among holders of claims or interests.").

[81]   Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.), 335 B.R. 22, 28 (S.D.N.Y. 2005) ("[T]ransactions that benefit insiders must withstand heightened scrutiny before they can be approved under § 363(b).").

24

3.  Dismissal under section 305

The CT Plaintiffs also ask the Court to dismiss this case pursuant to section 305(a) which authorizes a court to dismiss or suspend a bankruptcy case if the interests of creditors and the debtor would be better served by dismissal or suspension.[82]  The CT Plaintiffs allege that the Debtor will face heavy administrative expenses if its chapter 11 case moves forward and that they and the Debtors would be better served outside the chapter 11 process.  They contend that the Connecticut Court provides an appropriate forum for adjudicating their claims expeditiously, noting that a trial in their case had already been scheduled.  Finally, they assert that any plan proposed by the Debtor is doomed to fail as they are the only non-insider creditors eligible to vote and intend on rejecting it.[83]

The Debtor argues that the Connecticut Court is not a better alternative because the Bankruptcy Court provides the only forum where all issues among it, AIG, the CT Plaintiffs, and all other parties in interest can be adjudicated.[84]  Although those issues are not currently before the Court, the Debtor has articulated in an adversary complaint the many issues among the parties that it

---

[82]   11 U.S.C. § 305(a).

[83]   11 U.S.C. § 1129(a)(10) (allowing confirmation only if, inter alia, "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider").

[84]   See D.I. 173 at 252:14-21.

25

contends need to be resolved.[85]

The Debtor also argues that confirmation of a plan is possible even without acceptance by the CT Plaintiffs because their claims are really disguised equity interests.  It argues that: (i) the Compensation Plans make clear that the participants were to share in the risks and rewards of the Debtor's business; (ii) the Compensation Plans each provide that in the event of the Debtor's bankruptcy the CT Plaintiffs' claims would be subordinated to the Debtor's other obligations; and (iii) the purpose of the Compensation Plans was to align the employees' interests with those of the company's shareholders.[86]

The Court concludes that dismissal under section 305(a) is not warranted in this case.  Abstention in a properly filed bankruptcy case is an extraordinary remedy.  Therefore, dismissal is appropriate under section 305(a)(1) only where a court finds that both the debtor and its creditors would be better served.[87]

---

[85]   The Debtor's complaint seeks a declaratory judgment that: (i) the CT Plaintiffs are insiders and their claims should be disallowed as unreasonable compensation under section 502(b)(4); (ii) the $37 billion Revolver given by AIG is properly characterized as debt; (iii) the unpaid amounts under the Compensation Plans are subordinated to the AIG debt; (iv) the Compensation Plans' obligations to the CT Plaintiffs should properly be characterized as equity interests rather than debt; and (iv) certain of the CT Plaintiffs waived their claims.  Adv. No. 23-50110, Adv. D.I. 1.

[86]   D.I. 2 Ex. C at p. 2 & § 4.01; D.I. 132 Ex. F at § 4.01.

[87]   In re AMC Investors, LLC, 406 B.R. 478, 487 (Bankr. D. Del. 2009).

Among the factors that courts consider in making this determination are:  the economy and efficiency of administration; whether another forum is available or there is already a pending proceeding in state court to protect the interests of all parties; whether federal proceedings are necessary to reach a just and equitable solution; whether there is an alternative means of achieving an equitable distribution of assets; whether the debtor and creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; whether a non-federal insolvency case has proceeded so far that it would be costly and time consuming to start afresh with the federal bankruptcy process; and the purpose for which bankruptcy jurisdiction has been sought.[88]

The Court concludes that under this standard, the grounds for dismissal under section 305 do not exist here.  This bankruptcy case provides the only forum where all issues among the Debtor, AIG, the CT Plaintiffs, and other stakeholders can be adjudicated.  Accordingly, it cannot be said that dismissing this case would be in the best interests of the Debtor and any of its creditors, other than perhaps the CT Plaintiffs.[89]  Thus, the Court will deny dismissal of this case under section 305.

---

[88]   Id. at 488.

[89]   It is not entirely clear that even the CT Plaintiffs would benefit from allowing the Connecticut litigation to proceed to conclusion because it is clear that the Debtor has no ability to pay any judgment they may get.

IV.   <u>CONCLUSION</u>

    For the foregoing reasons, the Court will deny the CT Plaintiffs' Motion to Dismiss or Abstain.

    An appropriate Order is attached.


Dated: May 10, 2023         BY THE COURT:

                             Mary F. Walrath
                             United States Bankruptcy Judge