**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: AIG FINANCIAL PRODUCTS CORP., | : | Chapter 11 |
| | : | |
| Debtor. | : | Bankr. No. 22-11309-MFW |
| | : | |
| | : | |
| EMPLOYEE PLAINTIFFS, | : | |
| | : | |
| Appellants, | : | |
| v. | : | Civ. No. 23-573-GBW |
| | : | |
| AIG FINANCIAL PRODUCTS CORP., | : | |
| | : | |
| Appellee. | : | |

## MEMORANDUM OPINION

This appeal arises in the chapter 11 case of AIG Financial Products Corporation ("AIGFP" or the "Debtor"), in connection with a motion to dismiss the Debtor's chapter 11 case filed by certain of AIGFP's former employees who sued AIGFP in Connecticut state court for deferred compensation (the "Former Executives"). The Former Executives' motion to dismiss was denied by the Bankruptcy Court's May 10, 2023 Order (B.D.I. 194)[1] ("Denial Order") and accompanying Opinion, *In re AIG Fin. Prods. Corp.*, 651 B.R. 463 (Bankr. D. Del. 2023). The Former Executives have appealed that decision. For the reasons set forth herein, the Denial Order is affirmed.

## I.    BACKGROUND

### A.    The Parties and the Deferred Compensation Plan

The following background appears largely undisputed. The Debtor is a wholly owned subsidiary of American International Group, Inc. ("AIG"). (A21 ¶ 5.) The Debtor was founded in

---

[1] The docket of the chapter 11 case, captioned *In re AIG Financial Products Corp.*, No. 22-11309-MFW (Bankr. D. Del.) is cited herein as "B.D.I. __," and the appendix (D.I. 13) filed in support of the Former Employees' opening brief is cited herein as "A__."

1987 as a joint venture between AIG and investment bankers from Drexel Burnham Lambert Inc., the purpose of which was to allow AIG to access the capital markets and generate returns from trading in complex financial derivatives.  (A23 ¶ 10.)

In December 1995, AIG entered into a General Guarantee Agreement (the "Parent Guarantee") with the Debtor, by which AIG "generally agreed to guarantee all of [the Debtor's] monetary obligations."  (A1227-A1229; A1086 ¶ 16)  AIG thereby guaranteed AIGFP's monetary obligations to counterparties.  (A1227 ¶¶ 1-2.)  To the extent AIG paid an obligation of the Debtor under the Parent Guarantee, AIG would have a subrogated claim against the Debtor.  (A1228 ¶ 5.)

Around the same time in 1995, the Debtor also established a Deferred Compensation Plan (A1231-A1266) ("DCP") for its executives and AIG whereby a portion of the compensation of its highly compensated executives (the "Plan Participants") was deferred.  (A35 ¶ 43.)  Until then, AIGFP's annual profits were distributed immediately—70% to AIG and 30% to the executives. (*Id.*)  By deferring a portion of the profits, the DCP aimed to increase AIGFP's capital and to incentivize the pursuit of AIGFP's "long term integrity" over short-term gain.  (A1232, A1237.)[2]

The deferred compensation was not segregated from the Debtor's general funds nor held in trust for the Plan Participants, but simply reflected on a ledger of their accounts.  (A1244-A1245 § 4.01(a).)  Further, the DCP expressly provided that the benefits due to the Plan Participants "shall not have the benefit of any guarantee by AIG of payment obligations of [the Debtor]."  (*Id.*)  The Plan Participants' accounts were subject to being reduced by the amount of any losses suffered by the Debtor in excess of certain reserves, but the Debtor was required to restore those balances (with interest) from future profits pursuant to a plan to be proposed by its board of directors.  (A1245-

---

[2] In 2007, AIGFP introduced another compensation plan—the Special Incentive Plan.  (A1268-A1279.)  That plan mirrors the DCP with respect to the Parent Guarantee and the junior and subordinated status of obligations thereunder.  (A37 ¶¶ 49-50.)

A1244 § 4.01(b).)  In the event of an insolvency or bankruptcy proceeding, the DCP provided that the Plan Participants had an unsecured claim for any amounts due to them under the DCP.  (A1244-A1245 § 4.01(a).)

As a result of the financial crisis in the United States in 2008 and 2009, the Debtor was left owing tens of billions of dollars on its complex financial obligations and suffered a severe liquidity crisis.  (Adv. D.I. 20 at ¶¶ 94-98.)  To avoid the massive losses that would be realized if the Debtor were forced to liquidate its holdings immediately, AIG obtained loans of almost $100 billion from the Federal Reserve Bank.  (*Id.* ¶¶ 118-121)  With those funds, in September 2008, AIG (initially through its subsidiary AIG Funding, Inc.) extended the Debtor a $65 billion revolving credit line (A1281-A1286) (the "Revolver"), which expressly provides that AIG may provide loans to AIGFP in its "sole discretion."  (A1281 ¶ 1.1; A26 ¶ 18.)  AIGFP used money it borrowed under the Revolver to satisfy its obligations and collateral calls, helping avert a default.  (A26 ¶ 19.)

Over the last fourteen years, AIGFP has made many draws on the Revolver (totaling over $92 billion) and many repayments (totaling over $59 billion).  (A26 ¶ 20; *see* A1448-A1457.)  Over 150 repayments were for over $100 million each.  (A1448-A1457.)  At first, AIGFP also made periodic interest payments in cash, totaling approximately $6 billion, but more recently interest has been capitalized.  (A31-A32 ¶ 35.)

In October 2008, AIGFP began unwinding its portfolio positions.  (A27 ¶ 22.)  To close out its derivative transactions, AIGFP often needed to find replacement counterparties, but various factors—including transaction complexity, a global recession, and decreased appetite for risk— meant this would take many years.  (*Id.*)  As long as significant derivative transactions remained open, bankruptcy was not a viable option, as that would trigger defaults resulting in significant losses and asset depletion.  (*Id.* ¶ 23.)  AIGFP therefore resigned itself to a gradual wind down. AIGFP never recouped the tens of billions it lost as a result of the financial crisis.  (A21 ¶ 5; A34 ¶

42.) Because of that and the absence of "Distributable Income,"[3] AIGFP did not restore the amounts of deferred compensation due the Former Executives under the DCP nor credit any deferred compensation to the Former Executives' accounts. (A38 ¶ 52.)

### B.     Prepetition Litigation

In July 2014, AIGFP notified Plan Participants that its massive losses had wiped out account balances and precluded their restoration, and that, under the terms of the DCP, any restoration obligation lapsed at the end of 2013. (A849.) AIGFP's failure to restore account balances led to protracted litigation with former executives attempting to recoup their wiped out balances. In 2014, a group of London-based former AIGFP executives sued the company in England claiming that it breached the deferred compensation agreements by failing to restore account balances. (A38 ¶ 53.) The plaintiffs also brought a tort claim against AIG Inc. (*Id.*) In late 2018, the trial court dismissed the tort claim, but concluded that AIGFP had breached what the court viewed as an absolute obligation to restore account balances. (A38 ¶ 54.) In January 2020, the English Court of Appeal reversed. (A38 ¶ 55.) Finding that the restoration obligation was contingent on the existence of Distributable Income, the English Court of Appeal held that AIGFP was never obligated to restore the accounts. (A38-A39 ¶ 55.)

In December 2019, the Former Executives sued AIGFP in Connecticut state court, seeking $640 million in damages for breach of contract, breach of the implied covenant of good faith, and violations of the Connecticut wage-and-hour laws. (A39 ¶¶ 56-57; A2844 at 28:2-10.) AIG is not a party to this litigation. (A2844-A2845 at 28:24-29:1.) In May 2021, the Connecticut Superior Court denied AIGFP's motion to strike the complaint. (A39 ¶ 58.) In August 2022, the Former Executives filed a motion to compel the Debtor to produce certain documents that it had withheld or

---

[3] The DCP defines "Distributable Income" as AIGFP's "revenues, less expenses and credit and market reserves taken for that year." (A1234.)

redacted as privileged.  The Connecticut state court granted that motion in part, finding that the

Debtor had waived the attorney-client privilege with respect to a potential recapitalization of the

Debtor by AIG and the restoration of the DCP, and it ordered the Debtor to produce 14 specific

documents in unredacted form by December 14, 2022.  (A899-A901.)  The Debtor did not produce

the court-ordered documents and instead filed its chapter 11 petition on December 14, 2022.

     **C.**     **The Chapter 11 Filing**

     Earlier in the year, in January 2022, AIGFP's Board of Directors approved the formation of

a Special Committee, with duties running solely to AIGFP, to explore the possibility of

reorganization or some other strategic transaction.  (A40-A41 ¶¶ 59-62; A2831; A2932-A2933.)

The Special Committee consisted of Pamela Corrie and John Dubel, each of whom had recently

been appointed to the Board as independent directors, and each of whom had over thirty years of

restructuring experience.  (A40 ¶ 59; A1334-A1335; A2923-2924.)  The Special Committee

retained Alvarez & Marsal LLC ("A&M") as its financial advisor and Latham & Watkins LLP

("Latham") as its counsel, and appointed William C. Kostorus of A&M as Chief Restructuring

Officer ("CRO").  (A19 ¶ 1; A40 ¶ 60.)

     The Special Committee directed Latham to analyze whether the Revolver would be viewed

as debt or equity in bankruptcy.  (A40-A41 ¶¶ 60-61.)  Latham spent over a thousand hours on that

analysis, reviewing several hundred thousand documents.  (A41 ¶ 62.)  Based on Latham's analysis,

the Special Committee concluded the Revolver balance was valid debt that would be senior in

bankruptcy to claims arising under the DCP.  (*Id.* ¶ 61; A2948.)  The Special Committee also

initiated a comprehensive review of AIGFP's open financial positions, which took six months.

(A2854-A2856; A2238 at 121:12-22.)  The Special Committee ultimately determined that many of

the open derivative positions were covered by safe harbor provisions in the Bankruptcy Code,

meaning that a chapter 11 filing would expose AIGFP to hundreds of millions of dollars of potential

losses because counterparties would be allowed to terminate trades and unilaterally determine damages. (A2840-A2841; A2856-A2857; A2955-A2957; A3147 n.63.)  The Special Committee therefore concluded that it would be imprudent to file a chapter 11 petition unless it first novated the open positions. (A2855-A2856.)  Between September and December 2022, AIGFP novated virtually all of the remaining 97 third-party derivative positions, leaving it with no such positions. (A32-A33 ¶ 37; A2335 at 151:14-152:1; A2445 at 49:14-51:14).

On the same day it filed its chapter 11 petition, the Debtor filed a proposed plan of reorganization and related disclosure statement. (A135-A257.)  The plan provides that, in full discharge of the Revolver, AIG would retain its equity interests in AIGFP.  (A41-A42 ¶¶ 63-64.) The plan further provides that, if the Former Executives' class votes to accept the plan, it will receive a pro rata distribution from a cash pool of $1 million.  (A201-A202 at I.A.2.)  In the event that AIGFP fails to confirm a plan of reorganization, AIGFP plans to market its assets and "pursue and consummate" a sale under 11 U.S.C. § 363, with AIG anticipated to bid in such a sale.  (A43 ¶ 66; A210.)  If AIG was the "highest and best bidder," AIGFP would seek to consummate the sale in exchange for "the satisfaction, settlement, discharge, and release of a portion" of AIG's Revolver claim.  (A210.)

### D.  The Motion to Dismiss the Chapter 11 Case

On January 13, 2023, the Former Executives filed a motion to dismiss the Debtor's  chapter 11 case.  (A535-A575.)  They argued that the case should be dismissed because (1) AIGFP's petition was not filed in good faith, which courts consider "cause" for dismissal under § 1112(b) of the Bankruptcy Code, and (2) there is a "substantial or continuing loss to or diminution of the estate and [an] absence of a reasonable likelihood of rehabilitation," 11 U.S.C. § 1112(b)(4)(A).  (A557-A574.)  Among other things, the Former Executives asserted that the Debtor was not experiencing financial distress because, on the eve of the bankruptcy filing, the Debtor was flush with cash, no

creditor was pressuring it for payment, and its obligations to counterparties were guaranteed by AIG which had billions of dollars in cash reserves. They also sought dismissal under § 305(a)—sometimes referred to as abstention—arguing that "the interests of creditors and the debtor would be better served by dismissal." (A574-A575.) On May 10, 2023, following depositions, extensive briefing, and an evidentiary hearing which included witness testimony, the Bankruptcy Court issued the Denial Order and accompanying Opinion denying the motion to dismiss the chapter 11 case.

The Bankruptcy Court concluded that AIGFP's bankruptcy petition was filed in good faith, finding, among other things, that AIGFP faces "sufficient financial distress to warrant a bankruptcy filing" as it "has no prospect of ever realizing sufficient cash to pay even a fraction of its obligations and is facing mounting legal bills to defend a suit by a small group of its creditors." *In re AIG Fin. Prods.*, 651 B.R. at 472. The Bankruptcy Court also found that the petition serves a valid reorganizational purpose because "it is preserving value that would otherwise be lost outside of bankruptcy by stopping the accrual of interest on the Revolver and the costs associated with the Connecticut litigation" and "the Debtor is operating its current derivative business in a manner that reduces losses to the estate." *Id.* at 473.

The Bankruptcy Court further concluded there were no grounds for dismissal under § 1112(b)(4)(A). AIGFP, the Bankruptcy Court explained, is not experiencing substantial losses because it has sufficient liquidity to pay its administrative expenses. Further AIGFP's chapter 11 petition reduced accruing losses by eliminating interest due on the Revolver and expenses related to the ongoing Connecticut litigation. *See id.* at 475. With respect to rehabilitation, the Bankruptcy Court explained that (i) the Former Executives may "ultimately agree to some settlement" that will "allow a [reorganization] plan to be confirmed," and (ii) even if not, AIGFP could toggle to a § 363 sale and thereby "stem [AIGFP's] losses and allow for the orderly monetization of the Debtor's derivative rights." *Id.* at 475-76.

Finally, the Bankruptcy Court found no grounds for dismissal under § 305(a). *See id.* at 476-77. This bankruptcy case," it explained, "provide[s] the only forum where all the issues among the Debtor, AIG, [the Former Executives], and other stakeholders can be adjudicated." *Id.* at 477. The Bankruptcy Court accordingly concluded that dismissal would not better serve both the debtor and its creditors, which is required for dismissal under § 305(a).

### E.   The Adversary Proceeding

In February 2023, shortly after its chapter 11 filing, AIGFP filed an adversary complaint seeking to adjudicate several critical issues.  The complaint seeks a declaratory judgment that (1) the Revolver balance is debt; (2) whatever AIGFP owes to the Former Executives is subordinate and junior to what AIGFP owes to AIG; and (3) any unpaid amounts under the DCP creates equity interests in AIGFP, and are not claims or debt.  (A1373-A1376.)  The complaint also seeks disallowance of any claim by the Former Executives under § 502(b)(4) of the Bankruptcy Code, arguing that the Former Executives are "insider[s]" seeking compensation that "exceed[s] the reasonable value of [their] services." (A1376-A1377.)  The Former Executives filed an answer, a counterclaim, and several cross-claims against AIG seeking a determination that their claims are senior to AIG's claim, including through recharacterization or equitable subordination of AIG's claim, as well as asserting breach of contract and tort claims.  (Adv. D.I. 20.)  The Debtor filed an Answer to the counterclaim against it on June 7, 2023.  (Adv. D.I. 24.)[4]

---

[4] The docket of the adversary proceeding reflects that on May 23, 2023, AIG was permitted to intervene in the adversary proceeding.  (Adv. D.I. 8.)  On July 26, 2023, the matter was assigned to mediation, which has not yet terminated.  (Adv. D.I. 32, 47.).  On July 28, 2023, AIG filed a Motion for Judgment on the Pleadings and Motion to Dismiss, which was joined by the Debtor, and which sought dismissal of the Former Executives' counterclaim and cross-claims.  (Adv. D.I. 33, 38.)  On May 9, 2024, the Bankruptcy Court issued its opinion and order denying that motion.  (Adv. D.I. 81, 82.)  Discovery remains ongoing.

### F.    The Appeal

On May 24, 2023, the Former Executives filed their notice of appeal of the Denial Order. (D.I. 1).  On October 6, 2023, AIGFP filed a motion to dismiss the appeal for lack of subject matter jurisdiction, on the basis that the Denial Order was not a final order.  (D.I. 26).  On February 27, 2024, this Court issued its Order (D.I. 35) and accompanying Memorandum Opinion (D.I. 34) denying the motion to dismiss.  The merits of the appeal are fully briefed.  (D.I. 12, 25, 30).  The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.    JURISDICTION AND STANDARD OF REVIEW

District courts have jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1).  As set forth in the Court's prior Memorandum Opinion and Order (D.I. 34, 35), the Denial Order is a final order.  *In re Brown*, 916 F.2d 120, 124 (3d Cir. 1990).

A district court reviewing a decision of the bankruptcy court "is governed by traditional standards of appellate review."  *In re USAfrica Airways Holdings, Inc.*, 192 B.R. 641, 642 (D. Del. 1996).  An appellate court reviews a bankruptcy court's denial of a motion to dismiss under 11 § 1112(b) for abuse of discretion, which "exists when the decision 'rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.'"  *In re LTL Mgmt., LLC*, 64 F.4th 84, 99 (3d Cir. 2023) (citation omitted).  Legal conclusions are thus reviewed de novo and factual findings are reviewed for clear error.  *Id.*  Concluding a bankruptcy petition is filed in good faith, and therefore meets § 1112's implicit good faith requirement, is an "ultimate fact."  *Id.*  When reviewing an "ultimate fact"—i.e., a "legal concept with a factual component"— the legal conclusion is separated from the underlying facts, and "the appropriate standard" is applied "to each component."  *Id.* at 100 (citations omitted).

Dismissal under § 305(a) is "committed to the discretion of the bankruptcy court." *In re EHT US1, Inc.*, 630 B.R. 410, 433 (Bankr. D. Del. 2021) (citation omitted). An appellate court will not "disturb an exercise of discretion unless there is a definite and firm conviction that the court … committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006) (quoting *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 320 (3d Cir. 2001)).

## III.   ANALYSIS

### A.     No Error In Denying Dismissal for Lack of Good Faith Under § 1112(b)(1)

Under § 1112(b)(1) of the Bankruptcy Code, a case can be dismissed "for cause." Section 1112 provides a non-exhaustive list of situations that qualify as "cause." 11 U.S.C. § 1112(b)(4). Although bad faith is not included, the Third Circuit has long held that a "lack of good faith constitutes 'cause.'" *In re LTL Mgmt.,* 64 F.4th at 100; *see In re SGL Carbon Corp.*, 200 F.3d 154, 159-62 (1999). For a bankruptcy petition to be filed in good faith, the debtor needs to be in "some degree of financial distress," the petition needs to "serve[] a valid bankruptcy purpose," and it cannot have been filed "merely to obtain a tactical litigation advantage." *In re LTL Mgmt.*, 64 F.4th at 100-01 (citations omitted). The good faith inquiry is "fact intensive" and requires a court to examine "the totality of facts and circumstances" and determine where a "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) (citation omitted).

The Former Executives argued that the Debtor did not file its case in good faith because (1) it was not experiencing financial distress of the type required by precedent in the Third Circuit, and (2) the filing does not serve a valid reorganizational purpose. The Bankruptcy Court properly rejected these arguments.

### 1.     No Error in Holding that the Debtor Faces Sufficient Financial Distress

As the Debtor correctly argues, the reason that "good faith necessarily requires some degree of financial distress" is that "the good-faith gateway" is meant to ensure that "the debtor faces the kinds of problems that justify Chapter 11 relief." *In re LTL Mgmt.*, 64 F.4th at 101, 102 (citation and emphasis omitted). "At its most basic level, bankruptcy is designed to handle the distribution problems arising when the system of individual creditor remedies harms the creditors as a group *and there are not enough assets to go around.*" *In re 15375 Mem'l Corp. v. BEPCO*, 589 F.3d 605, 620 (3d Cir. 2009) (emphasis added).

The record reflects that, at the time of its chapter 11 filing, AIGFP was balance-sheet insolvent. (A27 ¶ 24.) Specifically, AIGFP's unencumbered assets—consisting of $10 million in cash, $216 million in intra- and inter-company receivables, and a credit-linked note (the "Gibraltar Note")—had a book value of $315 million. (*Id.*; A34 ¶ 40.) AIGFP's unsecured liabilities, on the other hand, had a book value of $37.7 billion—$37.4 billion owed on the Revolver and $269 million in intra- and inter-company payables. (A27 ¶ 24.) Thus, AIGFP was balance-sheet insolvent by $37.4 billion even before accounting for any claims of the Former Executives. (*Id.*)

The Bankruptcy concluded that: (1) AIGFP "is overwhelmingly insolvent because its remaining assets are a fraction of the $38 billion in debts allegedly owed to AIG and the [Former Executives]"; (2) AIGFP "has no prospect of ever realizing sufficient cash to pay even a fraction of its obligations"; (3) AIGFP is "facing mounting legal bills" to defend the Connecticut litigation; (4) AIG "is under no obligation to continue to fund [AIGFP] indefinitely"; and (5) the Parent Guarantee from AIG "did not cover obligations to the [Former Executives]." *In re AIG Fin. Prods.*, 651 B.R. at 471-72. The Bankruptcy Court concluded that AIGFP "face[s] sufficient financial distress to warrant a bankruptcy filing." *Id.* at 472. The Bankruptcy Court's holding rests on factual findings supported by the record. Indeed, the problem AIGFP faces because of its massive "balance sheet

insolvency"—multiple creditors vying for its insufficient assets—is one that "Chapter 11 is designed to address." *In re LTL Mgmt.*, 64 F.4th at 102.

The Former Executives advance several arguments in support of their challenge to the Bankruptcy Court's financial distress holding. (*See* D.I. 12 at ¶¶ 32-39.) The Former Executives argue throughout their brief that the Revolver is not really a loan, but rather an equity contribution, and the Bankruptcy Court therefore erred in basing any determination of financial distress on that debt. For example, according to the Former Executives, the Bankruptcy Court's financial distress holding is "based only on AIGFP's assertion that the purported $37 billion debt it owed put it in financial peril even though it had no set interest rate, no payment date or schedule, cash interest was not paid in over a decade, and the purported debt was from AIGFP's parent and sole owner." (*Id.* ¶ 33.) The record reflects, however, that the Former Executives affirmatively waived the argument that the Revolver is anything other than valid debt for purposes of the motion to dismiss, representing to the Bankruptcy Court that "the legal nature" of the Revolver debt "is not the subject of this Motion and need not be decided now." (A539.) They reiterated that they "are not seeking adjudication of the recharacterization issue as part of [the motion to dismiss], nor do they take the position that this Court needs to determine" whether the Revolver is equity or debt in order to decide the motion to dismiss. (A539 n.5.) The Bankruptcy Court's treatment of the Revolver as debt for purposes of the motion to dismiss was not erroneous. (A3141-A3143.)

The "debt versus equity" argument is essentially repeated in the Former Executives' argument that AIGFP could not possibly be in financial distress because AIG "never expected [AIGFP] to repay the $37 billion" and the debt had "no payment date or schedule." (D.I. 12 at ¶¶ 30, 33.) The Court agrees that this is just another way of advancing the waived argument that the debt is not real debt. It misses the mark for additional reasons. The record reflects that AIGFP made hundreds of debt payments to AIG over the years, totaling approximately $59 billion (*see* A26

12

¶ 20) and, over AIGFP's protests, AIG refused to pay approximately $120 million that AIGFP had invested in a cash pool account managed by AIG, opting instead to offset those funds against the Revolver (*see* A2851-A2853.)  The argument further ignores the financial distress resulting from the Connecticut litigation: in addition to the Revolver, AIGFP faces the prospect of a $640 million judgment in Connecticut, in which case "a bankruptcy filing would be inevitable" because AIGFP would be unable to satisfy multiple, competing creditors—AIG and the 46 Former Executives—with assets that are dwarfed by its total debt. (A3149.)

The Former Executives further complain that "[t]he Bankruptcy Court summarily rejected the [Former Executives'] position that where, as here, a parent has guaranteed substantially all of the obligations of—and financially supported—the Chapter 11 debtor, the parent's financial condition is relevant to the financial distress inquiry." (D.I. 12 at ¶ 33)  According to the Former Executives, those findings are in error and run afoul of the Third Circuit's *LTL Mgmt.* decision. (*Id.*)  But the Bankruptcy Court properly rejected the Former Executives' contention that, in determining the Debtor's solvency, it must consider the financial condition of its parent, AIG. *See In re AIG Fin. Prods.*, 651 B.R. at 470-71.  "The financial condition of AIG is irrelevant because it is a separate legal entity from the Debtor." *Id.* at 471.  Indeed, "the general expectation of state law and of the Bankruptcy Code is that courts respect entity separateness absent compelling circumstances calling equity ... into play." *In re LTL Mgmt.*, 64 F.4th at 105 (quoting *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005)).

The Former Executives seek to invoke an exception to this rule based on the Third Circuit's *In re LTL Mgmt.* decision, where a parent provided a "funding backstop" for a subsidiary's liabilities. (*See* D.I. 12 at ¶¶ 33-34 (citing *In re LTL Mgmt.*, 64 F.4th at 108-09).)  Unlike this case, the parent in *In re LTL Mgmt.* was contractually committed to fund up to $61.5 billion of its subsidiary's tort liabilities—far more than the subsidiary could anticipate needing to pay in the

foreseeable future. *In re LTL Mgmt.*, 64 F.4th at 96-97, 106.  That "minimally conditional" and "reliable" funding backstop was deemed highly relevant to the subsidiary's financial health because it served as "an ATM disguised as a contract." *Id.* at 106, 109.

There is nothing similar here, so the exception discussed in *In re LTL Mgmt.* does not apply. As the Bankruptcy Court found: AIG is not obligated to fund AIGFP indefinitely; § 1.1 of the Revolver expressly states that AIG Inc. will provide (or not provide) loans to AIGFP in its sole discretion (A1281); the DCP expressly provides than any payment obligations thereunder "shall not have the benefit of any guarantee by AIG" (A1244); and AIG has indicated that it will not voluntarily pay any judgment arising from the Connecticut litigation, nor permit AIGFP to borrow money under the Revolver to pay it (*see* A2846-A2847). *See In re AIG Fin. Prods.*, 651 B.R. at 466, 471.  The Bankruptcy Court therefore properly rejected the Former Executives' argument that under *In re LTL Mgmt.*, a "parent's financial condition is relevant to the financial distress inquiry" whenever that parent has "guaranteed substantially all the obligations—and financially supported— the Chapter 11 debtor." (D.I. 12 at ¶ 33.)  Rather, *In re LTL Mgmt.* held that a parent's financial condition is relevant when the parent has agreed to fund the chapter 11 debtor to pay *the very debts* that form the impetus for the chapter 11 petition.  As the Bankruptcy Court noted, "in *LTL* there is a distinction.  There was a parent backstop for all the litigation claims, there is no such parent backstop here for your claims.  Do you concede that?" (A3099-A3100.)  The Former Executives answered: "Yes, we do concede that." (A3100.)  *In re LTL Mgmt.* requires no different outcome.

The Former Executive argue, "[i]t is well-settled in this Circuit that an entity cannot avail itself of the protections afforded by the U.S. Bankruptcy Code unless that entity suffers from 'imminent,' 'immediate,' and 'apparent' 'financial distress.'" (D.I. 12 ¶ 32 (citing *In re LTL Mgmt.*, 64 F.4th at 101).)  The Bankruptcy Court rejected the argument that an insolvent debtor cannot file a bankruptcy petition if it is not facing imminent financial distress in the form of pressure for

immediate payment from creditors. *In re AIG Fin. Prods.*, 651 B.R. at 471. "The cases cited by the [Former Executives] for that proposition involved solvent debtors who were not facing any imminent financial pressure or distress. They do not stand for the proposition that an insolvent debtor is not eligible for bankruptcy relief." *Id.* Indeed, as the Debtor correctly points out, the prototypical case in which the Third Circuit has dismissed a bankruptcy case because the debtor was not experiencing financial distress involved *solvent* debtors. *In re LTL Mgmt.,* 64 F.4th at 101; *In re Integrated Telecom*, 384 F.3d at 112; *In re SGL*, 200 F.3d at 163-64. In the only case involving an insolvent debtor, the debtor had no "real assets to preserve." *In re 15375 Mem'l Corp.*, 589 F.3d at 625. These cases require no different result for this Debtor, which is insolvent, has material (albeit insufficient) unencumbered assets to preserve, and multiple competing unsecured creditors.

While a debtor's financial distress must be "immediate enough to justify a filing," *In re LTL Mgmt.*, 64 F.4th at 102, "the [Bankruptcy] Code contemplates 'the need for early access to bankruptcy'" before a "'hopeless situation'" materializes, and "'a debtor need not be *in extremis* in order to file.'" *Id.* (first quoting *In re SGL*, 200 F.3d at 163; and then *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991)). The "immediate enough" requirement is aimed at weeding out premature filings where there is only an "'*attenuated* possibility standing alone' that a debtor 'may have to file for bankruptcy in the future.'" *Id.* (emphasis added) (quoting *In re SGL*, 200 F.3d at 164). As long as a debtor can "anticipate the need to file in the future," its petition is not premature. *Id.* (quoting *In re Cohoes*, 931 F.2d at 228). For that reason, a company need not wait "until after a massive judgment has been entered against it" before filing for bankruptcy. *In re SGL*, 200 F.3d at 164.

Here, AIGFP was already deeply insolvent, owing more than $37 billion to AIG. (A27 ¶ 24.) Interest was accruing at a rate of over $100 million per month. (A2838-A2839.) And AIG had complete discretion whether to extend any loan to AIGFP. (A26 ¶ 18.) Additionally, there was

15

a risk that the Connecticut state court would enter judgment (up to $640 million) in favor of the Former Executives. (A2952-A2953.) If that happened, AIGFP would have no way to pay that judgment—even putting aside the $37.4 billion AIGFP owes AIG under the Revolver. The Parent Guarantee does not cover obligations owed under the DCP. (A1244.) As chapter 11 or some other type of restructuring would be inevitable, AIGFP had no obligation to wait for that to happen—it was already in financial distress.

Given these factual findings, the deference they are due, and the Former Executives' concession that the Revolver can be treated as valid debt for purposes of the motion to dismiss, the Court agrees that the question of AIGFP's financial distress is not a close one. AIGFP's massive balance sheet insolvency, its mounting legal costs in the Connecticut litigation, and the prospect of a judgment it could never pay establish financial distress.

### 2.   No Error in Holding that the Chapter 11 Filing Serves a Valid Reorganizational Purpose

Financial distress is necessary but not sufficient to establish good faith. A good faith bankruptcy filing must also serve a valid bankruptcy purpose. *In re LTL Mgmt.*, 64 F.4th at 100-01. The Bankruptcy Court concluded that AIGFP's chapter 11 filing satisfies this element of the good faith inquiry. *In re AIG Fin. Prods.*, 561 B.R. at 474. A corollary of this element of the good faith inquiry is that a bankruptcy petition cannot be "filed merely to obtain a tactical litigation advantage." *In re LTL Mgmt.*, 64 F.4th at 101 (quoting *In re 15375 Mem'l Corp.*, 589 F.3d at 618).

A bankruptcy filing serves a valid bankruptcy purpose either by "preserving a going concern" or by "maximizing the value of the debtor's estate" through preserving "some value that otherwise would be lost outside of bankruptcy." *In re Integrated Telecom*, 384 F.3d at 119-20. The Bankruptcy Court held that the Debtor's bankruptcy filing served both purposes.

16

As the Bankruptcy Court found, "[AIGFP] has an ongoing business of winding down its portfolio and liquidating its assets and debts." *In re AIG Fin. Prods.*, 651 B.R. at 474.  This is supported by the record.  AIGFP continues to do what it has been doing for the last fourteen years— winding down and hedging its remaining complex assets.  Although it has successfully novated its third-party derivative transactions (*see* A33 ¶ 37), it continues to manage other outstanding financial positions (A33-A34 ¶¶ 38-40; A2848-A2849).  AIGFP also wholly owns ten subsidiaries, each of which is at some state of winding down, and AIGFP continues to manage their transactions.  (A28 ¶ 25; A2849-A2850.)  The Former Executives assert that AIGFP is not a going concern because it is winding down.  (D.I. 12 at 31 n.13.)  There is no such per se rule, and the Third Circuit's decision in *In re 15375 Mem'l* does not create one.  There, the Third Circuit concluded that the debtor was not preserving a going concern because "the Debtors [had] not conducted any business outside of litigation for several years and [had] no offices, operations, or employees."  589 F.3d at 624.  AIGFP, by contrast, is winding down its complex assets and operating its business in a prudent manner "that reduces losses to the estate."  (A3147.)

The Bankruptcy Court further held that the filing "preserv[es] value that would otherwise be lost outside of bankruptcy by stopping the accrual of interest on the Revolver and the costs associated with the Connecticut litigation."  *In re AIG Fin. Prods.*, 651 B.R. at 473.  AIGFP's filing thus serves a valid reorganizational purpose for another, independent reason: it "maximiz[es] the value of the debtor's estate."  *In re Integrated Telecom*, 384 F.3d at 120.  The record reflects that, prior to the bankruptcy filing, AIGFP was accruing over $100 million in interest per month on the Revolver.  (A2838-A2839.)  The bankruptcy petition stopped that accrual of interest.  The bankruptcy petition also stayed the Connecticut litigation, which has already cost AIGFP over $16 million, and which AIGFP estimates would cost an additional $12 million to litigate to judgment.

(A2845-A2846.) The Bankruptcy Court's holding is supported by findings which are not clearly erroneous.

The Former Executives reply that "the bankruptcy is only serving to diminish value of the estate, rather than preserve it." (D.I. 30 at 17.) They dispute that the bankruptcy filing maximized value by reducing the costs of the Connecticut litigation, as the bankruptcy process itself imposes considerable cost, "including over $20 million of professional fees." (D.I. 12 at ¶ 59.) The Debtor points out that the costs of the Connecticut litigation are *additive* to the costs of the bankruptcy, where a bankruptcy filing is inevitable. (A2918.) The Former Executives disagree, contending that bankruptcy costs are likely to surpass any costs that would have been incurred in the Connecticut litigation. (D.I. 30 at 16.) As the Bankruptcy Court found, the chapter 11 case is the only forum that can adjudicate all issues among the Debtor, AIG, the Former Executives, and all other parties in interest including the claims and counterclaims asserted in the adversary proceeding. *In re AIG Fin. Prods.* 651 B.R. at 477. Comparing bankruptcy costs to the costs of the Connecticut litigation does not change the good faith analysis.

According to the Former Executives, "[t]he record establishes that AIGFP's Chapter 11 was filed for the primary purpose of extinguishing their claims: this is plainly a litigation tactic." (D.I. 30 at 19-21.) That AIGFP's bankruptcy filing was intended to pressure the Employee Plaintiffs to settle is directly supported by the record, the Former Executives argue. Indeed, AIGFP director Pamela Corrie stated that AIGFP's decision to file for bankruptcy was premised on "the event that" (*i.e., because*) the Employee Plaintiffs did not "quickly fall in line and agree to a settlement." (A2342 at 177:6-18; *see also* A1102 ¶ 62; A2170-71.) They further emphasize the timing of the bankruptcy filing on the same day as the Connecticut court's December 14, 2022 document production deadline. "It filed at exactly the time necessary to avoid a court-ordered obligation." (D.I. 30 at 21.)

18

Indeed, filing a chapter 11 petition for the "primary, if not sole, purpose" of "orchestrat[ing] pending litigation" is not a valid bankruptcy purpose. *In re SGL*, 200 F.3d at 165 (first quoting *In re HBA E., Inc.*, 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988); and then quoting *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983)). So filing a petition "*merely* to obtain tactical advantages" in ongoing litigation provides grounds to dismiss the petition for lack of good faith. *Id.* Having concluded that AIGFP's filing served other valid bankruptcy purposes, however, the Bankruptcy Court saw no need to address the Former Executives' arguments that the filing was *merely* a litigation tactic: if the filing serves multiple valid bankruptcy purposes, it, by definition, could not have been "filed merely to obtain a tactical advantage." *Id.*

The Bankruptcy Court's conclusion that the bankruptcy filing serves a valid bankruptcy purpose is well supported by the record.

### B.      No Error in Denying Dismissal Under § 1112(b)(4)(A)

A bankruptcy case may be dismissed for "cause" when there is (A) a "substantial or continuing loss to or diminution of the estate" and (B) "the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). Both prongs of this standard must be satisfied. 7 COLLIER ON BANKRUPTCY ¶ 1112.04 (16th ed. 2023).

The first prong of the § 1112(b)(4)(A) standard "tests whether, *after the commencement of the case*, the debtor has suffered or continued to experience a negative cash flow, or alternatively, declining asset values." 7 COLLIER ON BANKRUPTCY ¶ 1112.04[a] (emphasis added). The Bankruptcy Court concluded that AIGFP is not "experiencing substantial losses." *In re AIG Fin. Prods.*, 651 B.R. at 475. The Former Executives challenge this on appeal, arguing that AIG "is suffering continued losses due to the cost of the Chapter 11 Case, including over $20 million of professional fees." (D.I. 12 at ¶ 59.) But as the Debtor points out, that number refers to prepetition fees, a large portion of which was for extensive Revolver and derivative portfolio analyses, as well

19

as for novating third-party derivative positions. (*See* D.I. 25 at 11-14 (summarizing legal analyses undertaken in anticipation of chapter 11 filing); A525-A528 (itemizing associated professional fees incurred by A&M and Latham).) Those one-time costs will not be replicated "after the commencement of the case." 7 COLLIER ON BANKRUPTCY ¶ 1112.04[a]. As for post-filing expenses, the Bankruptcy Court found that AIGFP has sufficient liquidity—from its $10 million in cash and the quarterly payments it will receive from the Gibraltar Note—to fund all anticipated administrative expenses during bankruptcy. (A3151; A2351 at 215:5-10.) Additionally, AIGFP continues to realize significant savings from not having interest accrue on the Revolver and not having to pay the ongoing expenses of the Connecticut litigation. (A27 ¶ 23.) The Bankruptcy Court's holding is supported by the record.

The second prong of the § 1112(b)(4)(A) standard applies only when the first is satisfied and asks whether "the debtor or some other party" will be able to stem the substantial or continuing loss to the estate "within a reasonable amount of time" or whether there is instead an "absence of a reasonable likelihood of rehabilitation." 7 COLLIER ON BANKRUPTCY ¶ 1112.04[a]. As there is no substantial or continuing loss, under the first prong, there is no need to apply the second prong.

Even assuming a consideration of the second prong were required here, the Former Executives argued below that there is no reasonable likelihood of rehabilitation because, as the only non-insider creditors, their vote is needed to confirm a plan and they will not vote to accept the Debtor's proposed plan. As an initial matter, the Former Executives appear to conflate "likelihood of rehabilitation" with likelihood of confirming a reorganization plan, and the only second-prong argument they make is that AIGFP cannot confirm a plan. (D.I. 12 at ¶¶ 56-61; A573-A574 ¶ 81.) The Bankruptcy Court held that it is not entirely clear that the Former Executives will not ultimately agree to some settlement with the Debtor which will allow a plan to be confirmed. *In re AIG Fin. Prods.*, 561 B.R. at 475. The Former Executives argue that "if that were the applicable standard, no

case would ever be dismissed under section 1112(b)(4)(A) of the Bankruptcy Code." (D.I. 12 at ¶ 60.)  But as the Bankruptcy Court noted, the Plan further provides that the Debtor will conduct a simultaneous process to sell "all or substantially all" of its assets to AIG or a third party under section 363." *In re AIG Fin. Prods.*, 561 B.R. at 475 (citing D.I. 7 at I.G.)  Thus, if the Former Executives' class votes to reject the plan, "the Debtor will be in a position to toggle to a sale promptly." *Id.*  "Even if a consensus is not reached, a sale under section 363 is a valid bankruptcy avenue which will stem the Debtor's losses and allow for the orderly monetization of the Debtor's derivative rights.  *Id.* at 475-76 & n.80 (citing *In re PPI Enterprises (US) Inc.*, 324 F.3d 197, 211 (3d Cir. 2003) (noting reorganization is not the only appropriate use of chapter 11 "since the Code clearly contemplates liquidating plans."); and 11 U.S.C. § 1123(b)(4) ("A plan may provide for the sale of all or substantially all of the property of the estate and the distribution of the proceeds of such sale among holders of claims or interests.")).  And notwithstanding the Former Executives' suggestion, the Bankruptcy Court noted, "there is no per se prohibition on a sale of a debtor's assets to an insider, although such transactions are subject to a heightened scrutiny standard." *Id.* at 476.

The Court finds no error in the Bankruptcy Court's determination that "there is no basis to dismiss the Debtor's case under section 1112(b)(4)." *In re AIG Fin. Prods.*, 651 B.R. at 476.

### C.  No Abuse of Discretion in Denying Dismissal Under § 305

The Former Executives further argued that the the chapter 11 case should be dismissed in the best interests of creditors and the Debtor.  Under § 305(a) of the Bankruptcy Code, a bankruptcy court "*may* dismiss" a bankruptcy case if "the interests of creditors *and* the debtor would be better served by such dismissal." 11 U.S.C. § 305(a)(1) (emphases added).

Dismissal under § 305(a)—sometimes referred to as abstention—is "an extraordinary remedy that should be used sparingly and not as a substitute for a motion to dismiss under other sections of the Bankruptcy Code." 2 COLLIER ON BANKRUPTCY ¶ 305.02.  "Few fact patterns fall

within section 305(a)," *id.* § 305.02[1], as "[t]he interests of both the debtors and the creditors must be served by granting [this] relief," *EHT US1*, 630 B.R. at 433.

The Court agrees that the requirement that dismissal under § 305(a) also be in the best interest of the Debtor presents an insurmountable challenge. Based on its prepetition work, AIGFP's Special Committee concluded, in its business judgment, that AIGFP would be best served in chapter 11. (A2964-A2965.) The Former Executives merely assert that the bankruptcy case is "essentially a two-party dispute" and that dismissal of the bankruptcy case in favor of allowing the Connecticut litigation to proceed would save AIGFP from incurring "substantial administrative expenses." (D.I. 12 at ¶ 74.) But that argument fails to consider that allowing the bankruptcy case to proceed saves AIGFP over $100 million a month in accrued interest and the significant expenses associated with continuing the Connecticut litigation. (A2838-A2839; A2845-A2846.) It also ignores the fact that, if the Connecticut litigation went forward, AIGFP would face the risk of a judgment it could not possibly pay, in which case it would be forced to file for bankruptcy anyway and incur the same administrative expenses that the Former Executives claim would be avoided by dismissing this bankruptcy case.

## IV.   CONCLUSION

For the reasons explained above, the Court will affirm the Denial Order. A separate Order will be entered.

Date: August 28, 2024

UNITED STATES DISTRICT JUDGE